UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | Criminal No. 04-43 (GK) |
| ) | |
| DARREN A. FERGUSON, ) | **FILED** |
| ) | |
| Defendant. ) | SEP 1 0 2007 |
| ) | NANCY MAYER WHITTINGTON, CLERK |
| | U.S. DISTRICT COURT |

## MEMORANDUM OPINION

Defendant Darren A. Ferguson has filed a Motion to Suppress Wiretap Communications [**Dkt. No. 40**]. Upon consideration of the Motion, Opposition, evidence presented at the Suppression Hearing on July 18, 2007 and August 21, 2007, the entire record herein, and for the reasons stated below, Defendant's Motion to Suppress Wiretap Communications is **denied**.

### I. BACKGROUND

The Government presented a total of five witnesses during the two-day Suppression Hearing held on July 18, 2007 and August 21, 2007. The Defendant did not call any witnesses to testify.

**A.   July 18, 2007 Hearing**

On July 18, 2007, the Government called as a witness Sergeant Michael Thurston of the Royal Bahamas Police Force ("RBPF"). The Court finds Sergeant Thurston, who testified at length, to be credible and believes he testified truthfully and accurately. He was responsive to all questions and never became evasive or hostile

on cross-examination; and he gave testimony that was comprehensive, objective, and internally consistent.

Sergeant Thurston testified that the RBPF initiated an investigation of the Defendant's alleged drug trafficking activities in 2001. As part of this investigation, the RBPF placed a wiretap on the Defendant's telephone line at his residence in the Bahamas.

Thurston testified that the wiretap was conducted pursuant to the Bahamas Listening Devices Act, which required the Bahamian Commissioner of Police to confer with the Attorney-General of the Bahamas before authorizing the use of a listening device for a period not to exceed fourteen days. If, at the conclusion of the first fourteen-day period, the RBPF wished to maintain the wiretap, Bahamian law required issuance of a new authorization for every subsequent fourteen-day period.

Sergeant Thurston testified that U.S. law enforcement agents played no role in initiation of the investigation or application for the wiretaps, although he did confer with agents from the United States Drug Enforcement Administration's ("DEA") Nassau, Bahamas country office from time to time about obtaining United States telephone numbers relevant to the investigation. He testified that U.S. agents were never permitted to listen to intercepted communications in real-time although they were occasionally allowed to listen to recorded conversations after the fact.

The Government also called RBPF Inspector Brian Rolle to testify on July 18, 2007. As with Sergeant Thurston, the Court finds Inspector Rolle to be credible and straightforward in his testimony and has no reason to question his veracity.

Rolle testified that he was responsible for the Ferguson investigation from October 2003 to February 2004. (Sergeant Thurston was responsible for the investigation for the period prior to October 2003). During that time, the Bahamian Commissioner of Police issued five fourteen-day authorizations to tap the Defendant's cellular telephone under the Bahamas Listening Devices Act. Inspector Rolle testified that these authorizations were properly obtained under Bahamian law. In total, the RBPF intercepted more than two thousand calls that it deemed relevant to its investigation.

Rolle testified that the investigation of the Defendant was an entirely Bahamian operation and that the Bahamian authorities decided not to prosecute the Defendant in the Bahamas because there was insufficient evidence to support a charge. He testified that he met with DEA Special Agent Lee Nash regarding the Defendant's activities in January 2004, after receiving permission from the Commissioner to do so. At that meeting, Rolle provided audio recordings and synopses of the Defendant's telephone conversations to Special Agent Nash.

The Government also called Special Agent Nash of the DEA's Bilateral Case Group to testify on July 18, 2007, who the Court finds to be a credible witness.

Agent Nash wrote the DEA-6 Report of Investigation on May 9, 2003, which initiated the Bilateral Case Group's investigation of the Defendant. In his report, Nash referred to "Title III intercepts." He explained that he used the term "Title III" to refer generically to wiretapped communications, and that his use of the term "Title III" did not mean that the wiretaps were approved under U.S. law.[1]

He testified that he met with Inspector Rolle in January or February 2004, at which time Rolle shared information obtained during the RBPF investigation with the DEA. Nash stated that he played no role in the actual RBPF investigation. He never monitored wiretap communications and did not direct RBPF officers to perform any wiretaps.

On cross-examination, he testified that DEA Special Agents Silas Spengler and Craig Wiles were stationed at the DEA's Nassau, Bahamas country office and that he did not know of the extent of their cooperation with the RBPF.

**B.   August 21, 2007 Hearing**

Because Special Agent Nash identified additional DEA agents in

---

[1] See Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq.

his testimony who were possibly in a position to provide additional relevant testimony, the Court ordered their testimony, which was taken on August 21, 2007.

On that date, the Government called Special Agent Silas Spengler to testify, who the Court finds to also be a credible witness.

Agent Spengler worked at the DEA's Nassau, Bahamas country office from late 2000 to 2002. He testified that he never directed the RBPF to conduct wiretaps regarding the Defendant or exercised any control over the RBPF investigation into the Defendant's activities. He would occasionally listen to audio recordings of intercepted calls, but never in real-time. On one occasion, he listened to recorded calls and took notes to assist Inspector Rolle with his workload.

More generally, Agent Spengler testified that he provided training and facilitated the provision of office supplies and other equipment to the RBPF. He would also engage in discussion with RBPF officers regarding active investigations being conducted by the RBPF and information was shared between the DEA and the RBPF at these sessions. However, control over its investigations was retained by the RBPF. Spengler testified that the DEA lacked the authority to direct the RBPF or tell it how to conduct its investigations. In particular, he never asked the RBPF to tap particular telephone

lines and never directed the scope of the RBPF investigation of the Defendant.

The Government also called Special Agent Craig Wiles to testify on August 21, 2007, who was a highly credible witness and the Court believes he testified truthfully.

Wiles testified that he was the DEA liaison with the RBPF's Drug Enforcement Unit from 2001 to 2003 and was the DEA point person for the Ferguson investigation. Neither Agent Wiles nor any other U.S. agent was ever given access to real-time intercepted calls by the RBPF. He did review the synopses or "line sheets" that were prepared by RBPF officers as they listened to intercepted telephone calls for a nine-day period in September 2001 and a seven-day period in December 2001. The RBPF chose which line sheets it wished to share with the DEA.

Agent Wiles prepared a number of DEA-6 reports regarding the RBPF's investigation of the Defendant. He too made reference to "Title III" intercepts in these reports. He explained that "Title III" was "police code" for wiretapped communications generally. He testified that the DEA never sought authorization under United States law to tap the Defendant's telephone lines.

Agent Wiles testified that he and Sergeant Thurston had a very close collegial working relationship and that Wiles thought highly of Thurston's professionalism. When he was first informed of the RBPF's investigation of the Defendant, Agent Wiles sought assurances

6

from Sergeant Thurston that the wiretaps complied with Bahamian law, and Sergeant Thurston assured him they were legal. Agent Wiles testified that he never had reason to doubt Thurston's representation that the wiretaps were conducted pursuant to Bahamian law.

## II. ANALYSIS

The Fourth Amendment and its exclusionary rule do not generally apply to the acts of foreign officials. United States v. Barona, 56 F.3d 1087, 1091 (9th Cir. 1995). There are two very limited exceptions to this general rule. First, if the circumstances of the foreign search are so extreme "that they shock the [judicial] conscience," a court can require exclusion of the evidence. Id. (internal quotation marks omitted). Second, "the exclusionary rule may be invoked if American law enforcement officials substantially participated in the search or if the foreign officials conducting the search were actually acting as agents for their American counterparts." United States v. Behety, 32 F.3d 503, 510-11 (11th Cir. 1994); see also United States v. Peterson, 812 F.2d 486, 490 (9th Cir. 1987); United States v. Delaplane, 778 F.2d 570, 573 (10th Cir. 1985); United States v. Morrow, 537 F.2d 120, 139 (5th Cir. 1976). This second exception is typically referred to as the Joint Venture Doctrine.

Defendant does not argue that the conduct of the RBPF "shocks the conscience." Instead, he contends that the cooperation between

the RBPF and the DEA was so substantial that it constituted a joint venture. When evaluating the admissibility of evidence under the Joint Venture Doctrine, a three-part analysis is required. <u>Barona</u>, 56 F.3d at 1092-93. First, the Court must determine if the participation of U.S. agents in the foreign investigation was so substantial that it constituted a joint venture. <u>Id.</u> at 1092. If a joint venture is found to exist, the Court must then determine if foreign law has been complied with. <u>Id.</u> Finally, if foreign law was not complied with, the Court must then determine if the U.S. agents acted on a reasonable belief that the foreign search complied with the foreign country's law. <u>Id.</u> at 1093. The evidence shall be excluded only if each step in the analysis is satisfied. <u>Id.</u>

### A. The Cooperation Between the RBPF and DEA Did Not Constitute a Joint Venture

Defendant contends that the cooperation between the RBPF and the DEA was so substantial that it constituted a joint venture. He analogizes the facts of this case to the facts of <u>Peterson</u> and <u>Barona</u>, where the Ninth Circuit held that joint ventures existed between U.S. and foreign law enforcement agents.

In <u>Peterson</u>, the DEA informed the Philippine Narcotics Command of a drug shipment aboard a ship bound from Thailand, via the Philippines, to the United States. 812 F.2d at 488. Philippine authorities tapped the telephone line of an individual involved with the drug shipment, monitored radio communications from the ship, and provided the DEA with tapes of the intercepted calls. <u>Id.</u> at 488-

89. The DEA provided assistance in daily "translating and decoding intercepted transmissions, as well as advising the Philippine authorities of their relevance." Id. at 490. DEA agents also "termed their actions a 'joint investigation' in their own testimony." Id. The Ninth Circuit therefore held that the district court clearly erred in concluding that the investigation did not constitute a joint venture. Id.

In Barona, the DEA requested that the Danish police place wiretaps on the Copenhagen hotel room telephone lines of two defendants. 56 F.3d at 1090. The information that was obtained from the wiretaps was immediately forwarded to the DEA and the DEA made a Spanish to English language interpreter available to the Danish authorities. Id. at 1094. The Ninth Circuit held that the district court did not err in finding this operation to be a joint venture. Id.

The factual scenario presented in this case differs greatly from those presented in Peterson and Barona, and therefore Defendant's reliance on those cases is misplaced. Here, the RBPF was responsible for initiating the investigation of the Defendant's suspected drug trafficking activities and its scope and direction was determined entirely by the RBPF.

DEA agents were never permitted to listen to intercepted communications in real-time. They were occasionally permitted to listen to audio recordings and review "line sheets" of recorded

calls, but the amount of information to be shared was closely controlled by the RBPF.  Additionally, on only one limited occasion, Agent Spengler reviewed recorded intercepted communications and took notes on those conversations to assist Inspector Rolle with his workload.  However, the RBPF intercepted more than two thousand calls and Agent Spengler's limited assistance was minimal given the overall scope of the RBPF investigation.

Thus, the level of cooperation present in this case falls far short of that found in Peterson and Barona.  Here, unlike both of those cases, the RBPF began its investigation on its own initiative.  DEA agents were never permitted to direct the day-to-day activities of the investigation and did not provide substantial resources, such as the provision of translation and decoding services.  See Peterson, 812 F.2d at 490.  Nor were intercepted communications immediately shared with U.S. agents as in Barona.

The fact that the RBPF shared information gained from the intercepted communications with the DEA does not weaken the analysis.  "Normal lines of communication between the law enforcement agencies of different countries are beneficial without question and are to be encouraged.  Criminal conspiracies...are sometimes international in scope," Morrow, 537 F.2d at 140, and the sharing of information across borders does not by itself create a joint venture.

The Court therefore concludes that the cooperation between the DEA and the RBPF was not so substantial that it constituted a joint venture. Defendant's Motion to Suppress Wiretap Communications must therefore be **denied**.[2]

### B. DEA Agents Reasonably Relied on Bahamian Representations That the Wiretaps Were Legal

Despite the fact that there was no joint venture in this case, the Motion to Suppress would have to be denied in any event because U.S. agents reasonably relied on RBPF representations that the wiretaps were legal under Bahamian law.

The good faith exception to the exclusionary rule applies if United States law enforcement agents have a reasonable belief that the foreign nation's laws were complied with. Barona, 56 F.3d at 1092-93; see also United States v. Leon, 468 U.S. 897 (1984).

Here, Special Agent Wiles testified that he specifically sought assurances from Sergeant Thurston that the wiretaps were being conducted lawfully pursuant to the law of the Bahamas. Sergeant Thurston assured him that this was the case. Agent Wiles respected Sergeant Thurston professionally and had no reason to doubt this assurance. Furthermore, Sergeant Thurston also testified that he believed that the wiretaps were performed pursuant to proper authorization under the Listening Devices Act, and that he had seen

---

[2] Because the Court concludes that a joint venture did not exist in this case, the Court need not consider whether Bahamian law was properly complied with. See Barona, 56 F.3d at 1094.

the original written authorization.  Based on this testimony, the Court finds that Special Agent Wiles had a good faith belief that Bahamian law was complied with and reasonably relied on Sergeant Thurston's representation to that effect.

Defendant argues that Agent Wiles had an obligation to seek further assurances that the wiretaps were legal under Bahamian law. The Court disagrees.  In Peterson, DEA officials sought and received assurances from the Philippine authorities that the wiretap in that case complied with the law of the Philippines.  812 F.2d at 492. The Ninth Circuit found this to be sufficient to trigger the good faith exception to the exclusionary rule.  Id.  As that court explained,

> American law enforcement officers were not in an advantageous position to judge whether the search was lawful, as would have been the case in a domestic setting.  Holding them to a strict liability standard for failings of their foreign associates would be even more incongruous than holding law enforcement officials to a strict liability standard as to the adequacy of domestic warrants.

Id.

The Court therefore finds that Agent Wiles acted reasonably in relying upon the representation of Sergeant Thurston that Bahamian law had been complied with.  For this additional reason, Defendant's Motion to Suppress Wiretap Evidence must be **denied**.

### III. CONCLUSION

For the foregoing reasons, the Defendant's Motion to Suppress

Wiretap Communications [**Dkt. No. 40**] is **denied**. An Order shall issue with this Memorandum Opinion.

Sept. 10, 2007

/s/ Gladys Kessler
Gladys Kessler
United States District Judge

**Copies to: Attorneys of record via ECF**